HOWARD M. COLEMAN v. W. T. SCOTT.

27 77
50 242

[FILED JUNE 27, 1889.]

1. **Garnishment.** An attaching creditor has no greater rights against the garnishee than were possessed by the defendant in the action, therefore where a debt has been assigned in good faith for a valuable consideration before the notice to the garnishee, the assignee will be protected; and if after a garnishee has answered and before judgment he is notified by the assignee, of the assignment of the claim to him before the service of no-

tice, the garnishee should at once bring the matter to the attention of the court by filing a supplemental answer. A garnishee who before answer has notice that the defendant in the action had assigned the debt to another before the notice of garnishment was served must state that fact in his answer to be protected from an action by the assignee of the debt.

2. **Practice.** Where the controlling facts in a case do not sustain the judgment, it will be set aside.

ERROR to the district court for Buffalo county. Tried below before HAMER, J.

*A. H. Connor*, and *John M. Stewart*, for plaintiff in error, cited: *Smith v. Ainscow*, 11 Neb., 476; *Cotta v. O'Neal*, 58 N. H., 572.

*Marston & Nevius*, for defendant in error.

MAXWELL, J.

This action was brought in the district court of Buffalo county to foreclose a mechanic's lien. On the trial of the cause the court found the issues in favor of the defendant and dismissed the action. The plaintiff alleges in his petition that "on or about the 5th day of July, A. D. 1887, the said plaintiff entered into a verbal contract with the said defendant to furnish him ninety-seven thousand seven hundred and eighty-five bricks at the agreed price of seven dollars per thousand, for the erection of a brick business house on lots numbered one hundred and fifteen and one hundred and sixteen, Kearney Junction, now the city of Kearney.

"In pursuance of said contract the said plaintiff furished said brick to the defendant for the erection of said business house, on and between the 5th day of July, 1887, and the 16th day of July, 1887, for the sum of seven dollars per thousand, amounting in the aggregate to the sum of six hundred and eighty-four and $\frac{49}{100}$ dollars. The

said plaintiff further says the said defendant at the time the plaintiff furnished said brick claimed to be the owner in fee of said lots numbered 115 and 116.

"The said plaintiff further says, said brick were sold and delivered to the said defendant after the representation and statement of the said defendant to the said plaintiff that he was the owner in fee of said lots, and with the understanding and belief on the part of the said plaintiff that the said defendant at the said time was the owner in fee of said lots and not otherwise.

"The said plaintiff further says the said defendant is the owner in fee of said lots, but alleges the fact to be that the deed records of said county do not disclose that fact for the reason that the said defendant fails and refuses to place on record his deeds to said lots.

"The said plaintiff further says on the 11th day of August, 1887, and within four months from the time of furnishing said brick, he, the said plaintiff, made an account in writing of the items or number of said brick so furnished the said defendant under said contract, and after making oath thereto, as required by law, filed the same in the clerk's office of Buffalo county, claiming a mechanic's lien therefor upon said lots and the building thereon.

"The said plaintiff further says the sum of $684.49, together with interest from the 16th day of July, 1887, now remains due and unpaid on said account."

The answer consists of a number of specific denials.

The testimony tends to show that one Samuel Coleman, a son of the plaintiff, had for several years prior to 1887 been engaged in the manufacture of brick at the city of Kearney; that from time to time his father had assisted him financially, the whole amount loaned to the time of the trial being in excess of $1,800; that early in June, 1887, Samuel Coleman had a large kiln of brick ready to burn, but not having means to purchase the necessary fuel he applied to the plaintiff, who furnished the necessary

money for that purpose but took a chattel mortgage on the kiln to secure the amount owing by Samuel Coleman to him. This mortgage is dated June 25, 1887, and was filed for record on the same day. While this mortgage was upon the brick the defendant purchased 97,784 of the same from Samuel Coleman. The latter claims he sold the same as agent for the plaintiff, but the defendant alleges that he sold the same as owner. The plaintiff and one Hoge testify that they informed the defendant soon after the execution of the mortgage of its existence, and that the price of the brick which he had purchased from Samuel Coleman was to be deposited in the Kearney National Bank for the plaintiff. This the defendant denied on his direct examination, but on cross-examination he testified :

Q. Do you remember of Mr. Hoge coming to you and reading a letter to you?

A. I remember seeing him there with a letter, but I paid no attention to him because he annoyed me so much.

Q. Did you tell him you would never have anything more to do with Sam Coleman?

A. I told him I would have nothing more to do with bricks until they were burned.

Q. Did you pay for any coal that burned the kiln in question?

A. I don't know—I did not go responsible for any more coal.

Q. Did Mr. Hoge say to you why he wanted you to pay the draft?

A. I don't know, only he wanted to know particularly whether I had paid it or not; he was interested in my purchasing the kiln of brick so he could get his claim.

Q. When was the first conversation you had with Mr. Hoge?

A. Before they were burned.

Q. How many conversations did you have with him?

A. I don't know — I could not turn down the street but he followed me.

Q. What for?

A. To get me to purchase those brick.

Q. H. M. Coleman never told you they were his?

A. After they were delivered he came to me and wanted pay for them.

Q. Did Mr. Hoge make you angry when he first talked with you about this draft?

A. Well, I got angry by the way he annoyed me.

Q. Do you remember what he said in the postoffice?

A. I can't put the words together; he had a letter in his hand.

Q. Did he read it to you?

A. He started to read it but I did not stay to listen to it.

Q. Did he go to see you?

A. Yes, sir; I took him over to see the brick, as a good many would be rejected.

Q. Are you personally acquainted with Samuel Coleman?

A. Yes, sir.

Q. Did you get brick checks with H. M. Coleman's name on them?

A. I got checks just like those I always got, as far as I noticed, and after the suit commenced that was brought up, and I looked them over and saw little small letters, H. M., put at the edge of the paper; I had not noticed anything on there before.

Q. When you met Mr. Hoge in the postoffice that was not the time you had the row with him, but that was before Miller's hardware store?

A. I had no row with him in the postoffice.

Q. You did have some trouble with him in front of Miller's hardware store?

A. Yes, sir, we had some pretty warm words.

Q. Samuel E. Coleman never told you these brick were his father's?

6

A. Not until after the brick were delivered.

Q. When did he tell you?

A. Right there and then; he said for me to pay the money into the Kearney National Bank.

Q. Do you remember the day he told you that?

A. No, sir; but it can be got at; the first time he told me to pay any money into the bank was that Saturday before I was garnished the next Monday.

Q. Did he not tell you then that his father would not want to draw any more on you until all the brick were delivered?

A. No, sir.

Q. Who had garnished you?

A. East's son and Wade.

Q. You have been indemnified in all these cases where you have been garnished?

A. Yes, sir.

It will thus be seen that the defendant had knowledge of all the facts as to the plaintiff's interest in the brick before he filed answers in the garnishment proceedings, and he should have set them up as a defense in those cases. This he evidently did not do. The garnishment proceedings seem to have taken place in justice's court. The attaching creditor had no greater rights against the garnishee than were possessed by the defendant in the action; therefore when a debt has been assigned in good faith for a valuable consideration before the notice to the garnishee, the assignee will be protected; and if after the garnishee has answered and before judgment, he is notified by the assignee of the assignment of the debt to him, before service of the notice, the garnishee should at once bring the matter to the attention of the court by a supplemental answer. (*Copeland v. Manton*, 22 O. S., 404; Maxw. Justice Pr., (5th Ed.), 341-2; Drake on Attachment, sec. 527; *Wakefield v. Martin*, 3 Mass., 558; *Dix v. Cobb*, 4 Id., 508; *Warren v. Copelin*, 4 Metc. (Id.), 598; *Littlefield v. Smith*,

17 Me., 327; *Winch v. Keeley*, 1 T. R., 619; *Walling v. Miller*, 15 Cal., 38; *Smith v. Clark*, 9 Iowa, 241; *Nesmith v. Drum*, 8 W. & S. (Pa.), 9; *Wilson v. Davisson*, 5 Munf. (Va.), 178; *Tazewell v. Barrett*, 4 H. & M. (Va.), 259; *Anderson v. De Soer*, 6 Gratt., 364.)

No question is made as to the *bona fides* of the plaintiff's claim, and as it is clearly established that the defendant had notice of such interest before the notice in the garnishment was served, he is not protected, but as he seems to be fully indemnified he probably will suffer no loss. Where the judgment of the court is against the established controlling facts in the case, it cannot be sustained. It follows that the judgment of the district court must be reversed and a decree will be entered in this court for the amount claimed in the petition, with interest thereon.

DECREE ACCORDINGLY.

THE other Judges concur.